DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL, YEE, BRUNNER & MEHTA
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Emails: danmsiegel@gmail.com;
emilyrose@siegelyee.com;

DEBORAH M. GOLDEN, *Pro Hac Vice Forthcoming*
THE LAW OFFICE OF DEBORAH M. GOLDEN
700 Pennsylvania Ave. SE, 2nd Floor,
Washington, DC 20003
Deborah M. Golden
Telephone: (202) 630-0332
Email: dgolden@debgoldenlaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN MCCLAIN, | ) Case No. |
| | ) |
| Plaintiff, | ) **COMPLAINT FOR DAMAGES,** |
| | ) **DECLARATORY AND INJUNCTIVE** |
| vs. | ) **RELIEF** |
| | ) |
| UNITED STATES OF AMERICA, | ) **DEMAND FOR JURY TRIAL** |
| | ) |
| Defendants. | ) |
| | ) |

**PRELIMINARY STATEMENT**

1. The Federal Bureau of Prisons staff failed to recognize that Sean McClain needed an immediate evaluation for his eye problems. Their failures led to his eye cancer being discovered late. Their additional failures to commit to basic standards of care led Mr. McClain to not only lose his eye, but also suffer in extreme pain. To this day, BOP staff fail to meet the standards for after-care and surveillance, leaving Mr. McClain in terror that he will lose his remaining eyesight or

*McClain v. USA,* No.
Complaint and Demand for Jury Trial - 1

develop untreatable metastatic cancer.

## JURISDICTION AND VENUE

2.    Mr. McClain brings this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §2671 *et seq*.

3.    This Court has jurisdiction under 28 U.S.C. § 1346(b)(2).

4.    The Court's jurisdiction over these claims is invoked under 28 U.S.C. § 1367.

5.    Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred.

6.    Mr. McClain has exhausted his claims by filing the required forms with the Defendant and having his claims denied.

## PARTIES

7.    Plaintiff Sean McClain, a 53-year-old man, was at all times incarcerated and under the supervision of the Federal Bureau of Prisons.

8.    Defendant United States of America is sued for Mr. McClain's personal injuries caused by the negligent or wrongful acts or omissions of its employees. Those employees were acting within the scope of their office or employment under circumstances where the United States, if a private person, would be liable to Plaintiff in accordance with the laws of the State of California.

## FACTUAL ALLEGATIONS

9.    For sixteen months, Mr. McClain had been telling BOP medical staff that he was experiencing flashes in his vision and had been losing vision in his left eye. For those sixteen months, BOP staff bounced Mr. McClain between general practitioners, nurses, ophthalmologists, and optometrists instead of coordinating appointments with the specialists that they knew he needed.

10.    In 2019, Mr. McClain was housed at Federal Correctional Institute ("FCI") Phoenix.

11.    On September 6, 2019, he made his first report of blurry vision in his left eye to the medical staff at FCI Phoenix.

12.    Staff ordered Mr. McClain an optometry evaluation on September 16, 2019, with a

target consult date of November 1, 2019.

13. BOP did not send Mr. McClain to see an optometrist in 2019.

14. On January 27, 2020, he again reported the problem to the medical staff at FCI Phoenix. He explained that his vision had continued to blur, and he had started seeing unusual lines and flashing lights in his left eye. Despite these symptoms of a serious problem, he was only again told that an appointment with an optometrist would be scheduled.

15. Mr. McClain never saw an ophthalmologist at FCI Phoenix.

16. Instead, in February 2020, the BOP transferred Mr. McClain to FCI Terminal Island in Los Angeles, where he remains. The BOP did not forward the decision to send him to an optometrist.

17. Immediately upon arrival, Mr. McClain informed the FCI Terminal Island medical staff of his symptoms.

18. In March 2020, BOP staff at FCI Terminal Island referred Mr. McClain to an optometrist for an evaluation.

19. At this point, Mr. McClain's medical records show that his left eyesight had fallen from 20/25 to 20/50 in just three months. Still, the BOP showed no urgency and Mr. McClain continued to wait for a consultation.

20. In July 2020, Mr. McClain again went to the BOP medical staff for help with his eye. A nurse practitioner diagnosed him with conjunctivitis. She prescribed him allergy eye drops but did not do anything to further along his consults.

21. Mr. McClain continued to submit sick calls, but nothing substantive was done.

22. In August 2020, another BOP nurse practitioner examined him but did nothing but advise him that the eye specialists had not come to the prison.

23. On September 22, 2020, another nurse entered an ophthalmology consult request in Mr. McClure's medical file.

24. Finally, on September 24, 2020—more than one year after he had initially reported eye problems—the BOP had Mr. McClain seen by the contracted ophthalmologist. That ophthalmologist suspected that Mr. McClain's problems were caused by glaucoma and

recommended further evaluation by an ophthalmologist.

25.     On October 2, 2020, Mr. McClain once again submitted a sick call and a request for urgent attention for his worsening vision.

26.     On October 7, 2020, Mr. McClain saw one of FCI Terminal Island's primary care doctors to complain about his eye. The provider noted that there was a consultation scheduled, but that it was not urgent.

27.     On October 14, 2020, Mr. McClain saw a different prison primary care doctor, again to seek help for his worsening eyesight.

28.     That doctor also noted that Mr. McClain had a non-urgent referral to an ophthalmologist. He also noted that he would schedule Mr. McClain for another optometry consult.

29.     By mid-October 2020, Mr. McClain still had not seen a glaucoma specialist and grew increasingly panicked. He emailed BOP Medical staff on October 14, 15, 19, 21, 22, 24, and 29 asking to be seen by a glaucoma specialist.

30.     On November 5, 2020, the prison-contracted ophthalmologist saw Mr. McClain. That ophthalmologist diagnosed Mr. McClain with suspected glaucoma and a possible detached retina. The ophthalmologist suspected choroidal melanoma (an eye cancer) and requested that he be sent to a retina specialist. The opthamologist's note reported that no testing had been done even though it was previously ordered.

31.     The ophthalmologist requested an "urgent retina consult for evaluation and treatment. Need ultrasound and extensive eval ASAP." The word "ASAP" was underlined four times.

32.     He told Mr. McClain that he needed a specialist the next day, if at all possible.

33.     On November 7, a nurse increased the urgency of Mr. McClain's request for an off-site ophthalmologist to "urgent", but only recorded that the concern was to evaluate and treat his retina due to an injury, rather than due to suspected choroidal melanoma.

34.     Finally, on November 12, 2020, Mr. McClain was seen by an outside ophthalmologist. He was sent to a specialist at UCLA. That specialist diagnosed him with

*McClain v. USA,* No.
Complaint and Demand for Jury Trial - 4

choroidal melanoma and recommended that he should be referred to UCLA for treatment of the cancer.

35.   On November 16, Mr. McClain's BOP medical records show that the prison doctor contacted an ocular oncologist at UCLA. The specialist asked for reports and diagnostics to be sent to her.

36.   Records on November 23, November 30, and December 4 note the referral to UCLA was pending.

37.   With no explanation to him of why plans changed, on December 9, 2020, Mr. McClain was taken to ocular oncologist Dr Jesse Berry at the USC Roski Eye Institute. Mr. McClain was diagnosed with interocular melanoma. Dr. Berry sent an order back to FCI Terminal Island that Mr. Clain needed a series of pro-operative tests to assess his cancer progression and his fitness for surgery.

38.   Dr. Berry staged his cancer as Stage IIIB.

39.   Dr. Berry informed Mr. McClain that the treatment would have been relatively simple had he been seen when his symptoms began, had the BOP medical providers realized that he was presenting with a serious issue and treated it with the urgency it required.

40.   Dr. Berry instructed that Mr. McClain should have surgery within two to four weeks.

41.   The examination notes and orders were scanned into the BOP medical records system and reviewed by a prison doctor on December 10.

42.   Unfortunately, Mr. McClain's options for treatment were severely limited by the time he saw Dr. Berry, due to how far the cancer had progressed.

43.   Medically, Mr. McClain was a candidate to undergo radiation treatment, which would preserve his eye, or enucleation, which is the removal of the eyeball.

44.   Radiation treatments for cancer require precise timing to keep the cancer from spreading throughout the body. The BOP communicated to Dr. Berry that it would not agree to regularly transport him as needed for radiation treatments. This meant that practically, Mr. McClain's only choice for treatment was enucleation. .

45.   Dr. Berry asked the BOP staff to inform Mr. McClain that they decided his only

option was enucleation. They did not.

46.    On January 20, 2021, Sean McClain thought that he was finally going to discuss treatment options for the cancer in his left eye.

47.    Rather, when he arrived, Dr. Berry told him that he had to lose his eye to have the best chance of saving his life.

48.    Despite his preference for radiation treatment, he consented to the enucleation surgery because he did not want to die.

49.    The surgery itself went fine. Dr. Berry gave the post-operative instructions not only to Mr. McClain, but also to the prison guards who transported him and, over the phone, to the prison medical director.

50.    Because having one's eyeball and surrounding tissue removed is excruciatingly painful, Dr. Berry prescribed Oxycodone. She also prescribed a steroid ointment to be applied to Mr. McClain's eye socket twice each day for four weeks. Finally, because Mr. McClain has glaucoma in his remaining eye, she prescribed drops that will treat the glaucoma and give him the best chance at preserving his remaining eyesight. She ordered him to return in two weeks for a post-surgical checkup and removal of the stitches.

51.    When Mr. McClain returned to FCI Terminal Island, a BOP nurse inexplicably discontinued his pain medication.

52.    Mr. McClain was left to spend the night feeling unrelenting post-operative pain.

53.    It was not until the next day that medical staff reinstated pain medication. Even so, he only got his pain medication irregularly as he recovered from his surgery. He continued to suffer in severe pain.

54.    That cruelty was the beginning of other major failures in follow-up care.

55.    After the BOP cancelled and rescheduled Mr. McClain's original post-surgical follow up appointment, Mr. McClain saw Dr. Berry on February 10, 2021, a week late.

56.    Dr. Berry found that the necessary ointment had not been properly applied to Mr. McClain's eye socket. He had an infection and the tissue of his eyelid had begun to bond with the sutures due to failures of post-operative care. He was also not being given the glaucoma drops to

*McClain v. USA,* No.
Complaint and Demand for Jury Trial - 6

preserve his sight in his right eye.

57.     Dr. Berry ordered that Mr. McClain be sent for a prosthetic appointment in eight weeks. The timing of eyeball prosthetic placement is important to support the development of the eye socket.

58.     Dr. Berry also ordered that Mr. McClain should have liver imaging every six months, to look for metastatic cancer. Ideally, she recommended alternating MRI and liver ultrasounds every three months for two years.

59.     She also recommended he have a glaucoma evaluation every three months, to maintain Mr. McClain's remaining eyesight. Again she noted, this time in capital and bolded letters that glaucoma treatment of his remaining eye was critical, "HE IS MONOCULAR AND THERE IS RISK OF VISION LOSS PERMANENTLY IF THIS IS NOT DONE --- THIS IS PARAMOUNT."

60.     She also requested a six-month follow-up appointment.

61.     Her notes report that she discussed this directly with the BOP medical doctor.

62.     Despite all these clear directions, the BOP was and continues to fail to follow up appropriately.

63.     He is not taken for his cancer screenings in a timely fashion, often going up to nine months between screenings.

64.     He did not receive a prosthetic eye until September of 2021. The seven-month delay resulted in permanent failures of his eye socket to properly form to hold the prosthesis. His body tries to reject it, which causes pain and disfigurement

65.     He has not received appropriate glaucoma care to ensure he keeps the sight in his remaining eye, and he fears permanent blindness for an utterly treatable condition.

66.     In short, Mr. McClaim has been physically, mentally, emotionally, and financially injured and damaged as a proximate result of the wrongful actions of the public employees named above and others.

67.     To this day, he suffers from the anxiety and distress that his cancer was caught too late and that follow up screenings are too few and far between.

68.     He also suffered and continues to suffer pain from the botched post-surgical follow up.

69.     He will have medical expenses all his life to care for his enucleated eye socket, and he fears the extra medical expenses he will incur after his release from incarceration.

**CLAIM FOR RELIEF IN VIOLATION OF THE FEDERAL TORTS CLAIM ACT (FTCA)**
(By plaintiff McCLAIN against defendant United States of America)
(28 U.S.C. §2671 *et seq*)

70.     Plaintiff incorporates by reference allegations in Paragraphs 1-69 above.

71.     BOP Medical staff acted within the scope of their office or employment under circumstances where the Defendant United States of America if it were a private person, would be liable to Plaintiff in accordance with the laws of the State of California.

72.     Under California law, a claim for medical negligence requires that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused damages to the plaintiff.

73.     Negligence by a correctional facility and its healthcare staff occurs whenever a person in custody is injured (or has an existing injury or illness worsened) due to being refused timely access to necessary treatment, medication, or evaluation by a physician after presenting a medical concern.

74.     BOP Medical staff breached their duty to Mr. McClain when they refused timely access to necessary treatment, medication, or evaluation of the issues with his left eye leading up to and following the surgical removal of his eye.

75.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions. Defendant is liable for the negligent acts of BOP employees acting on its behalf.

76.     The actions of the Defendant constitute negligence under California law.

77.     Sean McClain is entitled to actual and compensatory damages individually.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff McClain requests that this Court grant him relief as follows:

(1) General damages, in an amount to be determined;

(2) Special damages, in an amount to be determined;

(3) Compensatory damages for the pain and suffering that resulted from the negligence of the Defendant's employees and agents;

(4) Injunctive relief ordering the Bureau of Prisons to provide plaintiff with adequate medical care to preserve the health of plaintiff's remaining eye;

(5) Declaratory relief;

(6) Costs of suit; and

(7) Such other and further relief as the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff hereby respectfully demands a jury trial, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 24, 2023

SIEGEL, YEE, BRUNNER & MEHTA

By:  _/s/EmilyRose Johns_____
        EmilyRose Johns

*Attorneys for Plaintiff*